**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| STEADFAST INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-CV-0126-GKF-TLW |
| ) | |
| AGRICULTURAL INSURANCE COMPANY, ) | |
| n/k/a/ GREAT AMERICAN ASSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before this court is defendant Agricultural Insurance Company's counterclaim against plaintiff Steadfast Insurance Company. The parties have agreed to the facts upon which this case is to be tried, and have submitted their trial briefs to this court. For the reasons set forth in this opinion, this court concludes that judgment should be entered in favor of Steadfast Insurance Company.

**I. Procedural History**

Steadfast Insurance Company ("Steadfast") provided primary excess insurance coverage to the Grand River Dam Authority ("GRDA"), the entity that owns and operates the Pensacola Dam. After a series of floods beginning in or around November 1992, a number of lawsuits were filed against GRDA; the plaintiffs in those cases alleged that GRDA's operation of the Pensacola Dam caused or increased the flooding, resulting in damage to the plaintiffs' property. GRDA provided notice of the pending lawsuits to Steadfast.

In March 2005, Steadfast initiated this action against GRDA, seeking a judicial determination of its rights and obligations under the various excess insurance policies issued by Steadfast to GRDA. Later that year, Steadfast filed an amended complaint, naming Agricultural

Insurance Company ("Agricultural")–GRDA's provider of secondary excess insurance coverage for the policy period of May 16, 1993 to May 16, 1994–as a defendant. Agricultural filed a counterclaim and cross-claim against Steadfast and GRDA, seeking a judicial declaration that (1) Agricultural had no duty to defend or indemnify GRDA; and (2) Steadfast had not exhausted its coverage obligations under the policies it had issued to GRDA. Dkt. 19 at 8-9.

On July 21, 2006, this court determined that GRDA was entitled to Eleventh Amendment Immunity and granted GRDA's motion to be dismissed from this case. That same day, Steadfast filed a petition for declaratory judgment as to its coverage obligations in Craig County District Court. Agricultural was added as a defendant to that action in March 2008. Agricultural sought to dismiss the action pursuant to Okla. Stat. tit. 12, § 2912 (B) (8), on the grounds that the instant action involved the same subject matter. The Craig County District Court granted the motion to dismiss with respect to the 1993-94 policies. Joint Stipulation of Fact Ex. 29.

While the appeal of this court's decision to dismiss GRDA was pending, Steadfast and Agricultural filed cross-motions for summary judgment on Agricultural's counterclaim. Those motions were denied. Agricultural subsequently filed an Amended Counterclaim against Steadfast, asserting that (1) Steadfast was primarily liable for the costs incurred by Agricultural in defending and indemnifying GRDA; (2) Agricultural had an existing cause of action against Steadfast, which could have been asserted by GRDA had it not been compensated by Agricultural; (3) Agricultural had suffered damages as a result of GRDA's failure to defend and indemnify GRDA; and (4) the costs incurred by Agricultural in defending and indemnifying GRDA should be shifted to Steadfast, whose equitable position was inferior to Agricultural's

position. Joint Stipulation of Fact Ex. 40.

## II. Factual Background

The parties have submitted a Joint Stipulation of Fact as the agreed record on which this case is to be tried. Dkt. 153. The relevant facts are summarized below:

### A.    GRDA's Insurance Coverage

During the relevant time period, GRDA held primary liability insurance coverage through the State of Oklahoma. Joint Stipulation of Fact, Dkt. 153 ¶ 22. That insurance agreement was subject to a $200,000 personal injury/advertising injury limit and a $200,000 per occurrence limit.

Steadfast Insurance Company provided GRDA's first level of excess general liability insurance. The primary policy at issue in this case, Excess/Umbrella Liability Insurance Policy No. CC 6819817-00 (the "1993 Steadfast Policy"), had an effective policy period of May 16, 1993 to May 16, 1994. In subsequent years, Steadfast continued to issue Commercial Umbrella Liability Policies that provided GRDA's first layer of excess liability insurance (the "Subsequent Steadfast Policies"). The Subsequent Steadfast Policies were in effect for the following policy periods: May 16, 1994 to May 16, 1995; May 16, 1995 to May 16, 1996; May 16, 1996 to May 16, 1998; and May 16, 1998 to May 16, 2002.

The defendant in this case, Agricultural Insurance Company, provided GRDA's second layer of excess liability insurance for the policy period of May 16, 1993 to May 16, 1994. That policy, Policy No. EXC 794-72-20-00 (the "1993 Agricultural Policy"), provided coverage on a "following form basis" with respect to the 1993 Steadfast Policy. *Id.* ¶ 26.

### B.      The Underlying Lawsuits

In 1994, three lawsuits–*Wagoner v. GRDA*, (the "Wagoner Action"), *Roberts v. GRDA*, (the "Roberts Action"), and *Dalrymple v. GRDA*, (the "Dalrymple Action")–were filed in the Ottawa County District Court against GRDA.[1] The plaintiffs in those cases alleged that GRDA's operation of the Pensacola Dam caused multiple flood events from 1992 to 1994, resulting in damage to the plaintiffs' property. A fourth action, *Allman v. GRDA*, (the "Allman Action"), was brought against GRDA in 2001; the plaintiffs in that case sought recovery for losses that were caused by sixteen flood events between 1992 and 1999.

A class was certified in the Dalrymple Action for the purpose of determining the extent to which the flooding was impacted by GRDA's operation of the Pensacola Dam. The court found GRDA to be liable for the flood events and granted partial summary judgment in favor of the Dalrymple plaintiffs. Thereafter, the court entered two judgments for stipulated damage amounts in favor of four members of the Dalrymple class: Jeffry and Carol McCool were awarded $75,000, and Randy and Dena Stoner were awarded $58,377. These judgments were affirmed on appeal.

### C.      Steadfast's Defense and Indemnification of GRDA

In a letter dated June 5, 1996, GRDA notified Steadfast that it had paid $452,197.68 for the defense of the Wagoner, Roberts, and Dalrymple Actions. In response, Steadfast accepted the defense of those actions under the 1993 Steadfast Policy,[2] reimbursed GRDA for defense

---

[1] The 1993 Steadfast Policy was in place at the time the Wagoner, Roberts, and Dalrymple actions were filed.

[2] Since accepting the defense of the Wagoner, Roberts, and Dalrymple actions, Steadfast has paid $1,553,838.05 in defense of the GRDA. Joint Stipulation of Fact ¶ 36.

–4–

costs in excess of $200,000, and disclaimed coverage under the Subsequent Steadfast Policies that had been issued prior to the disclaimer.[3] Steadfast then tendered $121,427.90 and $406.64 to the Ottawa County District Court in partial satisfaction of the judgments entered against GRDA.

Later, Steadfast engaged in mediation with the remaining plaintiffs in the Dalrymple action and ultimately resolved eighty-eight of the ninety-four claims asserted in that case. Following the mediation session, Steadfast, GRDA and plaintiffs' counsel entered into a mediation agreement. *See* Dkt. 156, Joint Stipulation of Fact Ex. 47. In that agreement, Steadfast agreed to pay the full amount remaining on the 1993 Steadfast policy–approximately $8.5 million–in satisfaction of the mediated claims. In exchange, the plaintiffs whose claims were resolved by the mediation released GRDA and Steadfast from all claims for damages arising out of floods that had occurred between September 1992 and the date the releases were signed. Joint Stipulation of Fact, ¶ 37.[4] In addition, GRDA, Steadfast, and the plaintiffs' counsel agreed that "Steadfast's payment . . . exhaust[ed] all available policy limits provided under [the 1993 Steadfast Policy] to any party for any indemnity or defense expense for any claim for any flood event that occurred on or before May 16, 1994." Dkt. 156, Joint Stipulation of Fact Ex. 47.

---

[3] Steadfast concluded that only the 1993 Steadfast Policy applied to the Roberts, Wagoner, and Dalrymple actions, because (1) the Roberts and Wagoner actions were filed before May 16, 1994, and (2) GRDA had knowledge of the claims at issue in the Dalrymple Action prior to May 16, 1994. Joint Stipulation of Fact, Ex. 26.

[4] The mediation agreement was executed on September 30, 2005. It appears that the release agreements were signed shortly thereafter. *See* Joint Stipulation of Fact, Ex. 30 (sample Release and Settlement Agreement, executed October 18, 2005).

### D.     Agricultural's Defense and Indemnification of GRDA

Agricultural declined to contribute any amount toward the Dalrymple claims that were disposed of by mediation in September 2005. After those claims were resolved, however, Agricultural retained counsel to associate with GRDA's counsel in the defense of the remaining claims in the Dalrymple Action and the Wagoner, Roberts, and Allman Actions. Agricultural has paid fifty percent of the settlements reached after the Dalrymple mediation, with GRDA paying the remainder. Together, Agricultural and GRDA have paid $2,215,000 in settlement of these claims.

### III. Analysis

Agricultural styles this lawsuit as a dispute over whether its duty to defend and indemnify GRDA has yet been triggered. It submits that, under the terms of the 1993 Agricultural Policy, it will not be obligated to defend and indemnify GRDA until Steadfast[5] demonstrates that both GRDA's primary insurance coverage and its first layer of excess insurance coverage have been

---

[5] Agricultural submits that, because Steadfast seeks to invoke the coverage of the excess insurance policy, it bears the burden of demonstrating that GRDA's primary and excess insurance policies have been exhausted. Agricultural cites *Smith v. Government Employee Ins. Co.*, 558 P.2d 1160 (Okla 1976) in support of this claim. *Smith*, however, involved an *insured* who had settled with his primary insurer and later brought a garnishment action against an excess insurer; the insured was required to prove the performance of the condition precedent–the exhaustion of the underlying policies–before he could compel the excess insurer to perform. *Id.* at 1162. The *Smith* court reasonably concluded that the party seeking to invoke the terms of an insurance policy must first show that the conditions of that policy had been met. The logic of *Smith*, however, does not necessarily apply to the instant dispute between two *insurers* who are not in privity of contract. Unlike the *Smith* plaintiff, Steadfast has not attempted to invoke the terms of the excess insurance policy, nor does it seek to compel Agricultural to perform; instead, Agricultural seeks to raise the exhaustion issue as a basis for recovery against Steadfast. Given these facts, it is unclear that Steadfast should bear the burden of proving the exhaustion of the underlying insurance policies. The court concludes that it is unnecessary to resolve this issue, however, as it concludes that Agricultural does not have a viable cause of action against Steadfast.

exhausted.[6] *See U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corps.*, 37 P.3d 828, 831 (Okla. 2001) (noting that an excess insurer is not ordinarily liable to the insured "until after the primary coverage limits have been exhausted").

Although certain documents suggest that the underlying lawsuit exhausted the coverage limits of the 1993 Steadfast Policy,[7] Agricultural contends that this is not the case. It maintains that Steadfast took steps to artificially exhaust the 1993 Steadfast Policy, thereby shifting the cost of defending and indemnifying GRDA to Agricultural: Specifically, Agricultural asserts that Steadfast (1) improperly allocated defense and indemnity costs to the 1993 Steadfast Policy when portions of those payments should have been allocated to the Subsequent Steadfast Policies;[8] and (2) unilaterally altered the 1993 Steadfast Policy to lower that Policy's total

---

[6] "Agricultural's policy contains unambiguous provisions making its coverage excess to both GRDA's primary insurance ($200,000 per occurrence) and the $10,000,000 of aggregate coverage under Steadfast's three (3) successive policies." Dkt. 159 at 8.

[7] *See* Dkt. 156 ¶ 8 (mediation agreement between GRDA and Steadfast indicating that the 1993 Steadfast Policy had been exhausted).

[8] Agricultural maintains that Steadfast wrongfully treated all of the Dalrymple claims as though they were covered by the 1993 Steadfast Policy. In their settlement agreement, Steadfast and GRDA agreed that Steadfast's payments to the Dalrymple plaintiffs would exhaust the 1993 Policy, despite the fact that some of the flood events complained of by the Dalrymple plaintiffs took place after the expiration of the Policy. By treating all of the floods at issue in the Dalrymple Action as a single occurrence covered by the 1993 Policy, Steadfast limited its total liability to the coverage limit set forth in the 1993 Steadfast Policy, rather than the aggregate coverage amounts of the policies in place in 1993 and subsequent years.

Agricultural submits that each flood event complained of by the Dalrymple plaintiffs was a separate "occurrence" under Oklahoma law. *See* Dkt. 159 at 8,9. Therefore, it claims, the five flood events that occurred after the expiration of that policy should have been covered by the Subsequent Steadfast Policies. Agricultural maintains that, had the flood events been grouped in this manner, the 1993 Steadfast Policy would not have been exhausted and Agricultural's duty to defend and indemnify GRDA would not have been triggered.

–7–

liability limits.[9] Agricultural submits that, absent these impermissible actions, the 1993 Steadfast Policy would not have been exhausted and Agricultural's duty to defend and indemnify GRDA would not have been triggered. Accordingly, Agricultural asks this court to declare that the 1993 Steadfast Policy was not exhausted, to order reimbursement of the settlement and defense costs incurred by Agricultural, and to reallocate the costs associated with the Dalrymple settlement so that some of those costs are attributed to the Subsequent Steadfast Policies.

Regardless of the merits of Agricultural's claim of artificial exhaustion, this court cannot grant Agricultural the relief it seeks because, under Oklahoma law,[10] Agricultural does not have a viable cause of action against Steadfast. Agricultural primarily argues that it is entitled to recover against Steadfast pursuant to the theory of equitable subrogation.[11] Alternatively, it

---

[9] Agricultural submits that Steadfast unilaterally revised its 1993 Policy in two ways: First, eighteen months after the Policy expired, Steadfast issued a Revised Endorsement that placed defense expenditures within the policy limits; they had previously been considered separate from the $10 million policy limit. Second, Steadfast permitted GRDA to make only a single $200,000 payment in satisfaction of its agreement to pay (or carry insurance coverage amounting to) $200,000 per occurrence, under the theory that the flood events leading to the state-court actions constituted a single occurrence; Agricultural maintains that the separate flood events should be deemed separate occurrences, and that GRDA should therefore be required to pay an additional $200,000 for each additional occurrence. Agricultural asserts that each of these actions materially increased its exposure to liability.

[10] Although the parties cite to case law from a number of state and federal courts, they apparently agree that Oklahoma law governs this dispute. *See* Trial Brief of Agricultural Insurance Co., Dkt. 159 at 7, 8, 17 (citing to and making arguments "[u]nder Oklahoma law"); Trial Brief of Steadfast Insurance Co., Dkt. 157 at 5 (same). This court has found no evidence in the record to contradict the parties' assumption that Oklahoma law governs this case.

[11] Agricultural's Amended Counterclaim, Dkt. 118 ¶¶ 11-14, incorporates several elements of an equitable subrogation claim. *Compare id.* (discussing Steadfast's ultimate liability, the existence of an assignable cause of action, and Agricultural's superior equitable position), *with Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 26 Cal. Rptr. 2d 762, 768 (Cal. Ct. App. 1994) (listing six elements essential to an equitable subrogation claim, including a loss for which the charged party is liable, an assignable cause of action, and a showing that the charged party should, in fairness, be held liable).

suggests that it may maintain a direct cause of action against Steadfast for breach of the implied covenant of good faith and fair dealing.[12] For the reasons discussed below, this court concludes that neither of these causes of action are available to Agricultural.

### 1. The remedy of equitable subrogation is foreclosed by GRDA's mediation agreement with Steadfast.

Agricultural cannot prevail under the doctrine of equitable subrogation, its primary theory of recovery, because the mediation agreement between GRDA and Steadfast operates to defeat Agricultural's subrogated claim. "The doctrine of equitable subrogation is a tool to compel the ultimate discharge of an obligation by the person who in good conscience ought to pay it." *Bank of the Wichitas v. Ledford*, 151 P.3d 151, 114 (Okla. 2006). It permits a party who has paid an amount owed to another "to stand in the shoes of the party to whom the amount was owed and proceed against the third party primarily responsible for the amount paid." *Brown v. Patel*, 157 P.3d 117, 125 (Okla. 2007).

A subrogee's rights, however, are limited by the nature of the equitable subrogation claim. Agricultural's equitable subrogation claim is derivative; therefore, its rights against Steadfast "can rise no higher than [the rights] of [GRDA]." *PaR Truck Leasing Inc. v. Bonanza Inc.*, 425 F. 2d 695, 696 (10th Cir. 1970).[13] Accordingly, any legal or equitable defenses that would apply to a claim brought by GRDA will also apply to Agricultural's subrogated claim. *See id.* at 696 ("[I]n the absence of an actionable claim by [the insured], any claimed right of

---

[12] *See* Dkt. 159 at 20-21 ("There can be no question that in this case the duty of good faith and fair dealing was owed to the excess insurer . . . ." (quoting *Kaiser Found. Hosps. v. N. Star Reins. Corp.*, 90 Cal. App. 3d 786, 792 (Cal. Ct. App. 1979)).

[13] *See also Schmidt v. Grady Co.*, 943 P.2d 593, 595 (Okla. 1997) ("A subrogee acquires no rights greater than those of the party whose claim it has paid.").

subrogation by [its insurer] must necessarily fail.").[14]

Here, GRDA agreed that the payments made to the Dalrymple plaintiffs implicated the 1993 Steadfast Policy and ultimately exhausted that Policy. *See* Supplemental Stipulation Ex. 47, Dkt. 156 ¶ 8 (agreement between GRDA and Steadfast that the 1993 Steadfast Policy has been exhausted). This agreement would prevent GRDA from successfully raising a failure-to-exhaust claim against Steadfast. Because Agricultural is subject to all defenses that Steadfast could have asserted against GRDA, *see Fireman's Fund. Ins. Co. v. Md. Cas. Co.*, 26 Cal. Rptr. 2d 762, 768 (Cal. Ct. App. 1994),[15] the language of that agreement would likewise operate to defeat Agricultural's subrogated failure-to-exhaust claim. Accordingly, this court concludes that Agricultural's equitable subrogation claim must fail.

### 2. Oklahoma courts do not, and would not, recognize a direct cause of action between non-contracting insurers.

This court concludes that Agricultural's secondary basis for recovery–a direct cause of

---

[14] *See also Hartford Accident & Indem. Co. v. First Nat. Bank and Trust Co. of Tulsa*, 287 F.2d 69, 71-72 (10th Cir. 1961) ("[T]he party asserting the right [to subrogate] is subject to all legal and equitable defenses which the third party may have against the party into whose shoes the subrogee steps."); *Niemeyer v. U.S. Fid. & Guar. Co.*, 789 P.2d 1318, 1322 (Okla. 1990) ("[I]f subrogation were allowed, [the insurer] would stand in the same shoes as [the third-party claimant], and it would be subject to the defense that a third party claimant cannot bring a bad faith action . . . ."); *Lawyers' Title Guar. Fund v. Sanders*, 571 P.2d 454, 457 (Okla. 1977) (Doolin, J., dissenting) ("All subrogation rights of an insurance company are derivative from the rights of the insured, whether they arise from a conventional subrogation clause or from equitable principles. These subrogation rights, being derivative, can rise no higher than the rights from which they are derived.").

[15] "Thus when an insured has released a third party, neither the insured nor the subrogated insurer has any rights to recover from the third party." *Fireman's Fund. Ins. Co.*, 26 Cal. Rptr. 2d at 768; *see also Walbrook Ins. Co., Ltd. v. UNARCO Indus., Inc.*, Case No. 90 C 5111, 1992 WL 159266, at *3 n.4 (N.D. Ill. June 23, 1992) (unpublished) (noting the parties' agreement that equitable subrogation was not viable because the insured settled with its primary insurer).

action against Steadfast–is not available under Oklahoma law. Agricultural suggests that Steadfast owed a duty of good faith and fair dealing to both GRDA and Agricultural. Such a duty, however, ordinarily arises out of a contractual relationship,[16] and Agricultural did not enter into a contractual relationship with Steadfast. Nor is this court persuaded that such a duty can be implied by the relationships of the parties. Although some courts have imposed a direct duty between primary and excess insurers in the absence of a contractual relationship, "the majority of jurisdictions apparently adhere to the view that an excess insurer has rights against the primary only by way of equitable subrogation." *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 26 Cal. Rptr. 2d at 771;[17] *see also Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175,

---

[16] *See Allstate Ins. Co. v. Amick*, 680 P.2d 362, 363, 364 (Okla. 1984) (stating that, although an action for bad-faith failure to settle "against an insurance company by its *insured* is of course allowed," the "duty of dealing fairly and in good faith arises from the contractual relationship," and, "[i]n the absence of a contractual or statutory relationship, there is no duty which can be breached").

[17] In reaching its conclusion that "the only basis for [the excess insurer] to sue for breach of the implied covenant is by way of equitable subrogation to the insured's rights," the *Fireman's Fund* court first addressed, and rejected, the excess insurer's claims that earlier California cases supported a contrary result. *Fireman's Fund Ins. Co.*, 26 Cal. Rptr. at 772. The court first acknowledged that an earlier decision had expressly recognized an independent duty flowing from primary insurer to excess insurer; the court noted however, that the view expressed in that decision "failed to gain any currency" and "ha[d] been at least impliedly overruled" by a later statement of the California Supreme Court. *Id.* (discussing *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 164 Cal. Rptr. 709 (Cal. 1980) and *Transit Cas. Co. v. Spink Corp.*, 156 Cal, Rptr. 360 (Cal. Ct. App. 1979)). In addition, the *Fireman's Fund* court recognized an appellate-court opinion indicating that "the duty of good faith and fair dealing was owed to the excess insurer both by . . . the excess-insured . . . [and] the primary insurer." *Id.* at 772 (quoting *Kaiser Found. Hosps. v. N. Star Reinsurance Corp.*, 153 Cal. Rptr. 678, 682 (Cal. Ct. App. 1979)). The court determined that this language–which is quoted in Agricultural's trial brief, Dkt. 159 at 21–was merely "dictum," as the only question before the *Kaiser* court was whether the *insured* owed a duty of good faith to the excess insurer. *Id.* The court held that, notwithstanding the contrary language employed in *Transit Casualty Company* and *Kaiser Foundation*, there could be no independent claim for breach of an implied covenant absent a contractual underpinning. *Fireman's Fund*, 26 Cal. Rptr. 2d at 770, 772.

–11–

1178 (7th Cir. 1994) ("There are hints . . . of such a duty in a handful of cases from New York and New Jersey, but the overwhelming majority of American cases describe the duty that a primary insurer owes an excess insurer as one derivative from the primary insurer's duty to the insured.").

Oklahoma has not yet addressed the question of whether a secondary insurer may bring an independent bad-faith action against a primary insurer,[18] but there is little to suggest that Oklahoma courts would join the minority of jurisdictions in recognizing such a right. Indeed, Oklahoma courts have, in the past, been reluctant to find a duty of good faith and fair dealing in the absence of a contractual relationship. *See*, *e.g., Brown v. Patel*, 157 P.3d 117, 122 n.7 (Okla. 2007) (dispute between insured and insurer) ("We have explained that an insurer's duty to deal fairly and act in good faith must be based upon *either* a contractual or statutory relationship." (emphasis removed) (citation omitted)).[19] Moreover, policy considerations do not weigh in favor

---

[18] The Oklahoma Supreme Court has noted that such actions have been recognized in California. *See First Bank of Turley v. Fid. & Deposit Ins. Co.*, 928 P.2d 298, 307 n. 36 (Okla. 1996) (indirectly referencing *Kaiser Found. Hosps. v. N. Star Reins. Corp.*, 90 Cal. App. 3d 786 (Cal. Ct. App. 1979)).

[19] *See also*, *e.g., Gianfillippo v. Northland Cas. Co.*, 861 P.2d 308, 309 (Okla. 1993) (dispute between incidental beneficiary of insurance policy and insurer) ("But Walker's insurance policy was not made for the express benefit of [vehicle passenger] Gianfillippo. The policy was intended for the protection of the insured. It benefitted Gianfillippo only incidentally. Gianfillippo was merely a third-party claimant who lacked standing to bring a bad faith claim."); *Niemeyer v. U.S. Fid. & Guar. Co.*, 789 P.2d 1318, 1322 (Okla. 1990) (dispute between third-party claimant and an insurance company) (discussing the "situations in which an excess carrier has been allowed to sue a primary carrier," and listing only cases where "the primary carrier has failed to settle a claim in good faith with a mutual insured," and the duty to "use the utmost good faith in the disposition of claims" was extended to the excess insurer under the theory of equitable subrogation); *Allstate Ins. Co. v. Amick*, 680 P.2d 362, 363, 364 (Okla. 1984) (action by injured third party against insurance company) ("In the absence of a contractual or statutory relationship, there is no duty which can be breached.").

of the creation of such a right: To permit an excess insurer to proceed directly against a settling primary insurer would expose the settling insurer to additional liability, thereby disturbing the finality of the underlying settlement and reducing a primary insurer's incentive to settle. Although Agricultural suggests that these considerations are not sufficiently important to permit a primary insurer to "ride roughshod" over the rights of the excess insurer by entering into a settlement agreement that eliminates the remedy of equitable subrogation, *see* Agricultural Trial Brief, Dkt. 159 at 21 (quoting *Kaiser Found. Hosps.*, 153 Cal. Rptr. at 682), this court notes that excess insurers are not without means to protect themselves from the risk of collusive settlements. Indeed, an excess insurer is often in a superior bargaining position when it enters into contract negotiations with a potential insured; it may protect its interests by requiring its insured to obtain the excess insurer's approval prior to settling with the primary insurer,[20] or by providing that indemnity payments may be reduced or withheld in the event that the insured and the primary insurer fail to properly allocate costs among the underlying insurance policies.[21]

---

[20] *See Walbrook Ins. Co., Ltd. v. UNARCO Indus., Inc.*, Case No. 90 C 5111, 1992 WL 159266, at *3 (N.D. Ill. June 23, 1992) (unpublished).

[21] Oklahoma case law tends to support the viability of such a remedy. In *Smith v. Government Employees Insurance Co.*, the Oklahoma Supreme Court reviewed a garnishment action brought by an automobile owner against GEICO, an insurer. 558 P.2d 1160 (Okla. 1976), *abrogated on other grounds by Mustain v. U.S. Fidel. & Guar. Co.*, 925 P.2d 533 (Okla. 1996). Although GEICO did not insure the owner's vehicle, its insurance policy with another individual was implicated by the action. The policy provided that GEICO's insurance "shall be excess insurance over any other valid and collectible insurance." *Id.* at 1162 (citation omitted) (emphasis removed). The court concluded that the automobile owner, who had settled with his own insurer, could not recover against GEICO, as "there was no evidence showing that the maximum coverage afforded by [the underlying policy] had been exhausted by the settlement." The court stated that, absent proof of exhaustion, the settlement between the insured and his insurer could not affect the priority of payment, and that "[t]o hold otherwise would allow companies primarily liable to transfer liability by making token settlements." *Id.* This language suggests that Oklahoma courts would be receptive to an excess insurer's claim that it is not

In sum, Oklahoma's general reluctance to find a duty of good faith and fair dealing in the absence of a contractual relationship counsels against the recognition of an implied duty of good faith between two non-contracting insurers.  Furthermore, given the fact that excess insurers may protect their interests by contract and other means, the equitable "arguments in favor of [a] direct duty are not so compelling that [this court] could reasonably predict that [Oklahoma] would buck the national trend and declare that under the common law of [Oklahoma] a [first layer excess] insurer [owes] a direct duty, actionable in tort, [to] the [second layer excess] insurer." *Twin City Fire Ins. Co.*, 23 F.3d at 1180-81.  Accordingly, this court holds that Agricultural cannot assert an independent bad-faith action against Steadfast.

### IV.  Conclusion

For the reasons set forth in this opinion, this court concludes that Agricultural lacks a viable cause of action against Steadfast.  Accordingly, this court instructs that judgment should be entered in favor of Steadfast Insurance Company on Agricultural's counterclaim.

_____
Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

---

obligated to indemnify its insured when the insured settles with the primary insurer for an amount less than the limit of the underlying insurance policy.